UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHRISTIE LEE BURGDORF,

        Plaintiff,               CIVIL ACTION NO. 10-13719

        v.                    DISTRICT JUDGE THOMAS L. LUDINGTON

COMMISSIONER OF          MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION ON
CROSS MOTIONS FOR SUMMARY JUDGMENT [DKT. NOS. 14, 17]**

Plaintiff Christie Lee Burgdorf brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. Both parties filed summary judgment motions (Dkt Nos. 14, 17), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 3).

**I. RECOMMENDATION**

For the reasons set forth below, this Court finds that the ALJ did not provide the requisite "good reasons" for assigning Plaintiff's treating physician's opinion "limited weight." Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

## II. REPORT

### A. Procedural History

On October 24 and October 29, 2007, Plaintiff filed applications for DIB and SSI, respectively, asserting that she became unable to work on November 2, 2006. (Tr. 11, 129-34.) The Commissioner initially denied these applications on January 25, 2008. (Tr. 11, 109-12, 113-16.) Plaintiff then filed a request for a hearing, and on October 29, 2009, Plaintiff appeared with her present counsel via video before Administrative Law Judge ("ALJ") Paul R. Armstrong, who considered the case *de novo*. (Tr. 25-104.) In a December 7, 2009 decision, the ALJ found that Plaintiff was not disabled. (Tr. 11-21.) The ALJ's decision became the final decision of the Commissioner on July 14, 2010 when the Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on September 17, 2010. (Dkt. No. 1.)

### B. Background

Plaintiff, born March 26, 1960, was 46 years old on her alleged disability onset date and 49 years old as of the ALJ's decision. (*See* Tr. 129.) She has a GED, and was once certified as a nursing assistant. (Tr. 47, 171.) Plaintiff last worked as a nursing assistant in 2006. (Tr. 61, 62, 166-67.)

Plaintiff has asthma (Tr. 170, 181) and was in a car accident resulting in a right shoulder impairment (Tr. 19, 86). But on appeal, Plaintiff only challenges the ALJ's findings and conclusions related to her mental impairments. (Dkt. No. 14, Pl.'s Mot. Summ. J. at 9-19; Dkt. No. 18, Pl.'s Resp. to Def.'s Mot. Summ. J. at 3-6.) The Court therefore summarizes the record as it pertains to Plaintiff's mental impairments.

### 1. The 2007 Disability Reports

In a disability report completed in October 2007, Plaintiff stated that the following impairments prevent her from work: bipolar disorder, depression, anxiety, "mental illness," thyroid, and asthma. (Tr. 166.)  According to Plaintiff, these impairments result in the following functional limitations: trouble concentrating at work and getting along with people, frequent anxiety attacks (several per day), and depression.  (Tr. 166.)  The disability report indicates that Plaintiff had been prescribed Topamax, Trazodone, Wellbutrol, and Xanax for her depression and anxiety.  (Tr. 170.)

In a December 2007 function report, Plaintiff described her typical day. (Tr. 173.)  She stated that she wakes up, sometimes showers, has a cup of coffee and "look[s] out the window." (Tr. 173.)  She has a bowl of cereal and takes her medicine. (*Id.*)  She talks to her sister on the phone, picks a few things up around the house, and "look[s] out the window more." (*Id.*)  She also tries to "talk to a friend a little." (*Id.*)

### 2. The October 2009 Hearing Before the ALJ

Plaintiff, her sister, and a Vocational Expert testified at the hearing before the ALJ.  Plaintiff was represented by her present counsel and both the ALJ and counsel elicited testimony during the hearing.

#### (a) Plaintiff's Testimony

Plaintiff offered limited testimony about the nature of her mental impairments. Plaintiff's mother died sometime around 2002 in a fire (Tr. 304, 346), and Plaintiff expressed guilt over her mother's death because she was responsible for caring for her when the fire occurred (Tr. 35; *see also* Tr. 225).  Plaintiff explained that her "problems started after my mother's death . . . . [But] [e]ven in my childhood I had problems." (Tr. 45.)  According to Plaintiff, these problems include

anxiety attacks that contribute to her inability to leave her home. (Tr. 35, 38-39, 46.) Plaintiff testified that her anxiety prevents her from riding in a car traveling over 40 miles per hour or driving. (Tr. 39, 52.) She also stated that she fears heights, spiders, and flying. (Tr. 45.) Plaintiff attested that she tried to commit suicide three or four times. (Tr. 37.)

Because the ALJ was having some difficulty eliciting specifics about how Plaintiff's impairments precluded work (Tr. 47-48), Plaintiff's counsel questioned Plaintiff about this issue. (Tr. 50.) Plaintiff began by responding that "it just all started after my mom died." (Tr. 50.) Perhaps recognizing that Plaintiff continued to work for several years after he mom died, counsel directed Plaintiff to respond more specifically. (*See* Tr. 50.) Plaintiff explained, "I just wasn't performing my job [as a nursing assistant] right . . . . I was doing it too slow and my performance wasn't the way that they [wanted]. . . . I wasn't . . . getting the patients up on time, getting to dining rooms on time. And they said I was too attached . . . to the patients." (Tr. 51.) Plaintiff testified that she tried to go back to work as a house-keeper but her employment was short-lived. (Tr. 58.) She explained that her employer "didn't feel like it was working out. . . . I wasn't doing it the way that she wanted it done." (Tr. 58.)

### (b) Plaintiff's Sister's Testimony

Plaintiff' sister, Sharna Rager, also testified about Plaintiff's anxiety. Rager attested that Plaintiff feared leaving her home: "Getting her out the door is a task. Getting her in the car is a completely different task." (Tr. 60.) Rager added that she and her sister used to go out to dinner "two or three years ago" but she could no longer get Plaintiff to go with her. (Tr. 65.) She explained that Plaintiff does not like to be alone in open or small spaces, and that when she is around other people, for example in a waiting room, she gets anxiety attacks. (Tr. 68.) Rager testified that when

the anxiety attacks occur, Plaintiff cannot breathe, her face gets "real flush[,] [h]er eyes get real big and she keeps saying she's having a heart attack." (Tr. 72.)  Rager also agreed that Plaintiff had an irrational fear of objects.  (Tr. 71.)  For example, she explained that on the day of the hearing, Plaintiff became upset to the point of crying because a security guard used a wand to check the contents of Plaintiff's purse.  (Tr. 66.)

Rager also testified about other aspects of Plaintiff's mental impairments.  She explained that Plaintiff has concentration issues that prevent her from watching a "full sitcom." (Tr. 65.)  And when Plaintiff tries to clean something, for example her bathtub, she does not finish the task.  (Tr. 64.)  She also noted that Plaintiff had lost close to 100 pounds recently, and is "constantly shaking [her] legs, hands, rocking." (Tr. 70.)

Regarding Plaintiff's ability to work, Plaintiff's sister asserted that Plaintiff had anxiety attacks quite frequently while working as a nursing assistant.  (Tr. 72.)  Rager explained that Plaintiff was fired because she would "call in" quite often (apparently because of her anxiety).  (Tr. 60.)  She stated that Plaintiff did not work in 2007 or 2008.  (Tr. 64.)  It was Rager's opinion that Plaintiff could probably work as a parts assembler if someone monitored her and "remind[ed] her the whole time she's supposed to be assembling it." (Tr. 74.)

### (c) Vocational Expert's Testimony

Vocational Expert Diane Regan also testified at the hearing.  The ALJ first proposed the following hypothetical individual to the VE: a person limited to "light exertional duties," no overhead work with the right hand, and "simple, unskilled work." (Tr. 86.)  The VE stated that Plaintiff's past work as a nursing assistant was "semiskilled and medium [exertion]" and, accordingly, the hypothetical individual could not perform Plaintiff's past work.  (Tr. 86.)  The VE

stated, however, that such an individual could work as a sorter (4,000 jobs), an inspector/checker (18,000 jobs), and a small products assembler (8,000 jobs).  (Tr. 86-87.)

The ALJ then proposed a second, more limited, hypothetical individual for the VE to consider.  (Tr. 87.)  He asked the VE to assume the first individual additionally limited by "no more than superficial contact with supervisors, co-employees and the general public."  (Tr. 87.)  The VE testified that the additional limitation would not preclude the hypothetical individual from performing any of the three previously identified jobs.  (Tr. 87.)

The ALJ then asked the VE about other, still more restricted hypothetical individuals.  For example, the ALJ asked about an individual who could not focus on a simple, unskilled job for 15 minutes out of every hour, and a different individual who could not leave her home two days a month.  (Tr. 87.)  The VE testified that no "competitive employment" existed for such individuals.  (Tr. 87.)[1]

---

[1]At the hearing there was also some discussion about Plaintiff's history of alcoholism.  The ALJ noted that it was his responsibility to determine whether substance abuse was material to the disability determination.  (Tr. 43.)  Plaintiff attested that the last time she drank was in 2004.  (Tr. 40.)  And when the ALJ asked Plaintiff about medical records indicating drinking in 2005 and 2006, Plaintiff said that she could not recall those incidents but that she was certain that she did not drink after 2004.  (Tr. 37, 40-42.)  Plaintiff's sister testified that Plaintiff had not drank for over 2 years prior to the hearing (i.e., mid-2007).  (Tr. 43.)

It does not appear that the ALJ's disability determination rested upon determining when Plaintiff stopped drinking.  Further, it appears that he credited Plaintiff's sister's testimony in this regard:

> The record shows that the claimant abused alcohol after 2004, which leads the undersigned to find that she is not a credible historian on this point.  The claimant's sister testified that the claimant had not been drinking for the two years preceding the hearing.  While claimant's history of alcohol abuse is troubling, it is not material to this residual functional capacity determination, which reflects the limitations imposed by her medically determinable impairments, including the exacerbation of alcohol abuse.

(Tr. 17.)  Plaintiff does not challenge this determination by the ALJ, and, accordingly, the Court does

### 3. Medical Evidence

In June 2005, Plaintiff went to the emergency room via ambulance after she was found unresponsive in a parked car "with multiple pill bottles around her." (Tr. 301.) The suicide attempt was apparently triggered by Plaintiff being fired and an argument between Plaintiff and her husband over finances. (Tr. 346.) An evaluating physician, Dr. Purna Surapaneni, completed a probate-court "clinical certificate" to involuntarily hospitalize Plaintiff. (Tr. 334-37.) Plaintiff was hospitalized for three days and then transferred to a medical center for psychiatric services. (Tr. 347.) The hospital notes provide that Plaintiff had "obviously been drinking," and that "according to her family, she has had . . . at least one suicide attempt every year for the last few years." (Tr. 301.) Plaintiff, however, "admitted to one previous suicide attempt following her mother's death." (Tr. 346.) Dr. Surapaneni diagnosed Plaintiff with major depression, recurrent. (Tr. 306, 334.)

In May 2006, Plaintiff went to the emergency room for physical injuries following a domestic assault. (Tr. 361, 357-65.)

In December 2006, Dr. Kang Kwon, a psychiatrist, evaluated Plaintiff. (Tr. 224.) Dr. Kwon took a fairly extensive personal history from Plaintiff: he noted that Plaintiff blamed herself for her mother's death, her husband was an alcoholic (and later died in a motorcycle accident), and that her half-sister was bipolar. (Tr. 225.) Dr. Kwon noted a history of depression and anxiety and that in 2004 Plaintiff was admitted to the hospital for a suicide attempt. (Tr. 224.) He provided that Plaintiff's depressed mood was "problematic" on a four-point scale that ranged from "not present" to "slightly problematic" to "problematic" to "significantly problematic." (Tr. 226.) Dr. Kwon found that Plaintiff's obsessions were "slightly problematic" and her panic attacks "problematic."

_____

not discuss Plaintiff's history of alcoholism further.

-7-

(Tr. 226.)[2]   He assessed Plaintiff's cognitive and intellectual functioning as "alert [and] well oriented." (Tr. 230.) Dr. Kwon diagnosed Plaintiff with bipolar disorder, alcohol dependence, dependent personality, and indicated that depression should be ruled out. (Tr. 234.) He provided a Global Assessment Functioning ("GAF") score of 45 with Plaintiff's past-year high being 43. (Tr. 234.)[3]

On January 11, 2007 Plaintiff had a fifteen minute follow-up visit with Dr. Kwon for medication review. (Tr. 235.) Plaintiff reported that "[s]he can't hold [a] job [and] was fired again." (Tr. 235.) Plaintiff also told Dr. Kwon that she had not been leaving her house and that her husband was upset because she could not work. (Tr. 235.) Dr. Kwon prescribed Xanax and perhaps another, illegible medication. (Tr. 236.)

On March 10, 2007, Dr. Wladimir Zarski evaluated Plaintiff on behalf of the State Disability Determination Services ("DDS"). (Tr. 221-23.) Like Dr. Kwon, Dr. Zarski also took a fairly extensive personal history from Plaintiff. (Tr. 221-22.) Plaintiff reported physical abuse by her stepfather and sexual abuse by her stepfather's father as a child. (Tr. 221.) She told Dr. Zarski that "she has had depressive disorder and anxiety all her life [but her] depressed mood became more

---

[2]The Court notes that rating columns on the form Dr. Kwon used are misaligned: it appears that there are more criteria (ten) than spaces to rate the criteria (nine). (*See* Tr. 226.)

[3]A GAF score is a subjective determination that represents "the clinician's judgment of the individual's overall level of functioning." AMERICAN PSYCHIATRIC ASSOC., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("*DSM-IV*") 30 (4th ed., Text Revision 2000). It ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id*. at 32.

A GAF of 45 to 50 reflects "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

severe after her mother died in 2004." (Tr. 221.)  She informed the DDS physician that she becomes anxious from stress, being in public places, and driving.  (Tr. 221.)  Dr. Zarski noted four suicide attempts.  (Tr. 221.)  He also noted that Plaintiff had a recent history of thyroid dysfunction.  (Tr. 221.)[4]  Dr. Zarski found that while Plaintiff "had a worried expression" and her mood was "depressed," she was cooperative and pleasant during the exam, her attitude and manner were appropriate, and her psychomotor activity normal.  (Tr. 222.)  As for the standard memory tests, Plaintiff had little or no problems in recalling digits, presidents, states, and spelling "world" backward and forward. (Tr. 222.)  Plaintiff's calculations were "fair," she understood proverbs, and answered the standard judgment questions reasonably (e.g., she would put a found, stamped-addressed envelope in the mailbox).  (Tr. 223.)  Dr. Zarski diagnosed Plaintiff with "major depressive disorder, recurrent, most recent episode moderate[;] anxiety disorder, [not otherwise specified]."  (Tr. 223.)  He noted to rule out depressive features caused by Plaintiff's thyroid dysfunction. (Tr. 223.)  He assigned Plaintiff a GAF of 59, and stated her prognosis was "guarded." (Tr. 223.)[5]

On December 8, 2007, Dr. Zarski evaluated Plaintiff again on behalf of the State DDS.  (Tr. 254-56.)  This one was very similar to the March 2007 evaluation.  Dr. Zarski noted that Plaintiff felt "hopeless and helpless, and has crying spells when she thinks about her mother [who passed

---

[4]"[T]hyroid disease can affect your mood – primarily causing either anxiety or depression. Generally, the more severe the thyroid disease, the more severe the mood changes."  Todd B. Nippoldt, M.D., Mayo Clinic, *Thyroid disease: Can it affect a person's mood?* (Dec. 14, 2010) *available at* http://www.mayoclinic.com/health/thyroid-disease/AN00986.

[5]A GAF of 59 indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *DSM-IV* at 34.

away].” (Tr. 254.) As opposed to the four Plaintiff reported in March 2007, Plaintiff told Dr. Zarski that she tried to commit suicide eight times in the past. (*Compare* Tr. 221 *with* Tr. 254.) Plaintiff also described her anxiety as feeling like a heart attack, and when Dr. Zarski inquired into whether Plaintiff would return to work, she replied, “It seems I cannot be around a lot of people anymore. I can’t breathe. I’m nervous and anxious.” (Tr. 254.) As of March 2007, Dr. Zarski noted normal psychomotor activity, and Plaintiff adequately answered the standard mental-status exam questions (i.e., questions pertaining to memory, calculation, abstract thinking, etc.). (Tr. 255-56.) He again diagnosed Plaintiff with major depressive disorder, recurrent, moderate; anxiety disorder, not otherwise specified; and to rule out depressive features caused by thyroid dysfunction. (Tr. 256.) He assigned Plaintiff almost the same GAF score, 58 as opposed to 59, and again stated the Plaintiff’s prognosis was “guarded.” (Tr. 256.)

In January 2008, Ron Kriauciunas, Ph.D., a psychologist, completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique Form (“PRTF”) for the State DDS. (Tr. 258-275.) Dr. Kriauciunas based his evaluation solely upon a review of Plaintiff’s medical record – he did not personally see the Plaintiff nor, obviously, did he have the majority of medical records from Plaintiff’s treating physician. On the PRTF, Dr. Kriauciunas indicated that Plaintiff had the medically determinable impairments of major depressive disorder, recurrent, moderate and anxiety disorder, not otherwise specified. (Tr. 265, 267.) In evaluating the “B” criteria associated with Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders), *see* 20 C.F.R. pt. 404, subpt. P, app. 1, Dr. Kriauciunas concluded that Plaintiff had only “mild” limitations in activities of daily living, “moderate” limitations in maintaining social functioning and concentration, persistence, or pace, and only “one or two” episodes of decompensation (each of an

extended duration).  (Tr. 272.)  He also concluded that the medical evidence did not establish the presence of the "C" criteria.  (Tr. 273.)  On his mental RFC assessment, Dr. Kriauciunas found that Plaintiff was "not significantly limited" in most work-related functional areas.  (Tr. 258-59.)  Dr. Kriauciunas provided, however, that Plaintiff had "moderate" limitations in understanding, remembering and carrying out detailed instructions; maintaining concentration for extended periods; interacting appropriately with the general public; and responding appropriately to changes in the work setting.  (Tr. 258-59.)  His conclusion was that Plaintiff "is able to do simple, low-stress, unskilled work on a sustained basis."  (Tr. 260.)

From November 2007 through November 2009, Plaintiff was seen regularly (i.e., 22 times) by Dr. Frank J. Greene, a psychiatrist.  (Tr. 246-53, 282-97, 405-09.)  As indicated by the ALJ in his decision, and discussed further below, Dr. Greene's treatment notes are extremely difficult to decipher because of poor penmanship.  In some cases, however, while the Court is unable to read the entire sentence or phrase written by Dr. Greene, it is able to discern that Plaintiff is reporting about her daily activities, including issues with a "Kelly" and "babysitting." (*E.g.* Tr. 287 ("[Patient] has been taking care of her mom"); Tr. 288 ("I can't babysit anymore"); Tr. 289 ("[Patient] is trying to babysit less").)  The Court summarizes Dr. Greene's notes insofar as it is able to decipher them.

On November 5, 2007, Dr. Greene took Plaintiff's history and diagnosed her with bipolar disorder and post traumatic stress disorder.  (Tr. 250-51.)  On November 19, 2007, Plaintiff reported to Dr. Greene that she "can't work" and that she had uncontrollable "anger attacks."  (Tr. 252.)

Plaintiff continued treatment with Dr. Greene throughout 2008.  On February 25, 2008, Plaintiff reported that she felt worse and that she had some panic attacks.  (Tr. 284.)  But on March 10, 2008, Plaintiff indicated feeling "a bit better."  (Tr. 286.)  On March 24, 2008, Plaintiff told Dr.

Greene about a rash and that she could not eat (apparently because of abdominal pain).  (Tr. 286.)
Dr. Greene also made a note about a CT-scan but it is unclear to what medical issue this CT-scan
was related to.  (Tr. 286.)  He also observed that Plaintiff "bit[] her finger nails."  (Tr. 286.)  In April
2008, Plaintiff cancelled one appointment with Dr. Greene and was prescribed Xanax at another.
(Tr. 287.)  Plaintiff's next visit with Dr. Greene was not until July 2008.  (Tr. 287.)

On August 13, 2008, Plaintiff reported "having more panic attacks lately."  (Tr. 287.)  Dr.
Greene prescribed Wellbutrin for her panic attacks.  (Tr. 287.)  That day, Dr. Greene also indicated
on a prescription form that (1) Plaintiff was diagnosed with bipolar disorder, mixed type, post
traumatic stress disorder, panic disorder with agoraphobia; (2) her prognosis was poor; and (3)
Plaintiff could perform "no work."  (Tr. 279.)

In October 2008 Plaintiff reported that she and her younger daughter were arguing all the
time and that her daughter called her "filthy names."  (Tr. 289.)   In December 2008, Plaintiff
reported that her mood is "up and down."  (Tr. 288.)  She indicated that around Christmas time she
usually missed her mother more.  (Tr. 288.)

Plaintiff's first 2009 visit with Dr. Greene was not until April.  (Tr. 290.)  She reported
something about babysitting and her daughter, and also mentioned rotator-cuff surgery and that her
shoulder was "so painful."  (Tr. 290.)  On May 28, 2009, it appears that Dr. Greene noted that
Plaintiff "has had a couple of suicidal thoughts."  (Tr. 290.)  On October 20, 2009, Dr. Greene noted
that Plaintiff had not been well in five or six years.  (Tr. 291.)

That same day, October 20, 2009, Dr. Greene completed a "Medical Statement Concerning
Depression With Anxiety, OCD, PTSD or Panic Disorder for Social Security Disability Claim."  (Tr.
294-97.)  Regarding Plaintiff's symptoms, Dr. Greene noted that Plaintiff had pervasive loss of

interest in almost all activities, sleep disturbance, psychomotor agitation or retardation, difficulty concentrating or thinking, persistent irrational fear of a specific object, recurrent severe panic attacks, and recurrent and intrusive recollections of a traumatic experience. (Tr. 294.) Dr. Greene also provided that Plaintiff had "marked" limitations in activities of daily living and maintaining social functioning (criteria related to Step Three of the disability determination). (Tr. 294.) He also indicated that Plaintiff had deficiencies in concentration, persistence, or pace, and repeated episodes of decompensation of extended duration (although the form does not define this term). (Tr. 295.) Dr. Greene checked a box indicating that Plaintiff had "complete inability to function independently outside the area of [her] home due to panic attacks." (Tr. 295.) He also noted "marked" or "extreme" impairments in a number of work-related functional areas, including: Plaintiff's ability to remember work-like procedures, maintain regular attendance or be punctual within customary tolerances, sustain an ordinary routine without special supervision, complete a workday or workweek without interruptions from psychologically based symptoms, get along with coworkers or peers, and accept instructions from supervisors. (Tr. 296.) Dr. Greene provided no explanation for his selection of form-criteria, however, nor did he reference any of his largely illegible treatment notes. (*See* Tr. 294-97.)

Shortly after the hearing before the ALJ, on November 5, 2009, Dr. Greene wrote a (legible) letter in support of Plaintiff's disability claim. (Tr. 402.) It provides, in relevant part,

> Ms. Burgdorf was first seen by me on [November 5, 2007]. She gave a history of prior psychiatric treatment the prior 4-5 years. She told me she was diagnos[ed] with Bipolar and also Panic Disorder and Agoraphobia. She gives a history of mood swings with anger and irritability and episodes of rather severe depression.

-13-

She has made suicide attempts 4 or 5 times. She's been hospitalized 2004, 2005, 2006. She has been on a variety of medications and has become refractory to medication.

She remains severely depressed in spite of adequate doses of medication. She has had very few [m]anic episodes in recent years which is characteristic of the illness.

My current recommendation is that she receive Electroconvulsive Therapy (ECT).

Diagnosis
Bipolar Disorder Mixed Type Severe Recurrent.
Panic Disorder with Agoraphobia.
Post Traumatic Stress Disorder (from sexual molestation as a child).

(Tr. 402.) Additionally, on November 10, 2009, Dr. Greene rated Plaintiff's GAF at 40. (Tr. 402.)

## C. Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

-14-

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.  The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff has not engaged in substantial gainful activity since November 2, 2006 – Plaintiff's alleged disability onset date.  (Tr. 13.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "residuals of right rotator cuff tear, status-post arthroscopic repair; bipolar disorder; chronic alcoholism."  (Tr. 13.)  Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment.  (Tr. 14.)  In particular, the ALJ found that Plaintiff had only "moderate" limitations in three of the "B" criteria (activities of daily living, social functioning, and concentration, persistence, or pace).  (Tr. 14.)  Between steps three and four, the ALJ determined that Plaintiff had the residual functional

-15-

capacity to perform light work with additional restrictions: simple, unskilled work, no overhead work with the right, dominant hand, and no work "requiring public contact or more than superficial contact with supervisors or co-employees." (Tr. 15.)  At step four, the ALJ found that Plaintiff could not perform any past relevant work.  (Tr. 20.)  At step five, the ALJ relied on VE testimony in response to his hypothetical, and found that work existed in significant numbers that Plaintiff could perform: sorter, inspector/checker, and small products assembler.  (Tr. 21.)

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial

evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F.  Analysis

#### 1. The ALJ Failed to Comply with the Treating Physician Rule In Rejecting Dr. Greene's Opinions

Although Plaintiff makes several arguments on appeal, her primary claim of error is that the ALJ improperly rejected the opinions of Dr. Greene, her treating psychiatrist. (*See* Pl.'s Mot. Summ. J. at 11 (describing the ALJ's treatment of Dr. Greene's opinions as the "most troubling" aspect of

the ALJ's decision).)  Dr. Greene, who had treated Plaintiff 22 times over a two-year period, provided three significant evaluations of Plaintiff.  First, in August 2008, after treating Plaintiff for about nine months, he diagnosed Plaintiff with bipolar disorder, post traumatic stress disorder, and panic disorder with agoraphobia and concluded that Plaintiff could not work ("August 2008 Opinion").  (Tr. 279.)  The ALJ rejected this opinion insofar as it addressed the ultimate question of disability reserved to the Commissioner.  (Tr. 18 (citing 20 C.F.R. § 416.927(e)(2)).)  Second, in October 2009, after treating Plaintiff for close to two years, Dr. Greene completed a "Medical Statement Concerning Depression With Anxiety, OCD, PTSD or Panic Disorder for Social Security Disability Claim" ("October 2009 Opinion") which indicates that Plaintiff had "marked" limitations in two of the Step-Three "B" criteria and severe limitations in a number of work-related functions. (Tr. 294-97.)  The ALJ assigned this functional assessment "limited weight" because, according to the ALJ, it was not well-supported and was inconsistent with other evidence of record.  (Tr. 18.) Third, in November 2009, Dr. Greene wrote a letter ("November 2009 Letter") stating that Plaintiff has not been responsive to medication and should undergo electroconvulsive therapy.  (Tr. 402.)

The Commissioner responds that the ALJ properly discounted Dr. Greene's opinions. According to the Commissioner, the fact that Dr. Greene's longitudinal notes are largely illegible is "relevant" because the applicable regulations provide for a correlation between the weight assigned an opinion and the medical evidence produced by the medical source to support that opinion.  (Def.'s Mot. Summ. J. at 14 (citing 20 C.F.R. § 404.1527(d)(2)).)  The Commissioner further argues, as did the ALJ in his decision, that Dr. Zarski and Dr. Kwon's evaluations are inconsistent with Dr. Greene's opinions.  (Def.'s Mot. Summ. J. at 15.)

-18-

For the following reasons, this Court agrees with Plaintiff that the ALJ did not fully comply with the treating source rule.[6]

Under the treating source rule, an ALJ must generally give greater deference to the opinions of treating physicians than to those of non-treating physicians. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527; SSR 96-2p. The rationale behind this rule is straightforward:

> treating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

Treating-source analysis proceeds in two steps. First, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p. Second, where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must apply the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating

---

[6]The Commissioner does not dispute that Dr. Greene is a treating source. And for good reason. Dr. Greene saw Plaintiff over 20 times during a two-year period.

-19-

source." *Id.*; 20 C.F.R. § 404.1527.  In addition, as will be discussed in more detail below, the

treating-source rule contains a procedural, explanatory requirement that an ALJ give "good reasons"

for the weight given a treating-source opinion.  *See e.g.*, *Wilson*, 378 F.3d at 544; *Rogers*, 486 F.3d

at 243.

      Here, the ALJ provided that "Dr. Greene's opinion is not well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is inconsistent with the other substantial

evidence in the case record.  As such, it cannot be accorded controlling weight." (Tr. 18.)  While

the ALJ used the correct legal standard for determining whether Dr. Greene's opinions should be

entitled to controlling weight, the Court does not believe the standard was applied correctly.

      As for the first half of the controlling-weight inquiry, whether Dr. Greene's opinions were

well-supported by clinical or laboratory diagnostic techniques, the ALJ emphasized the lack of a

"useful longitudinal record to substantiate Dr. Greene's opinions." (Tr. 18.)  But elsewhere the ALJ

conceded that there could be support among Dr. Greene's treatment notes if only Dr. Greene's

handwriting was decipherable:

> Dr. Greene's treatment records would potentially provide the
> strongest support for the claimant's allegedly disabling functional
> limitations, but their content remains a mystery.  The doctor's notes
> are almost entirely illegible, and what little the undersigned can make
> out does not support disabling symptoms.

(Tr. 17.)  Similarly, at the hearing, the ALJ stated,

> Here's what I suggest. Counsel, if you can get something, which can
> give me a longitudinal because you know, she's got a nice work
> history and she's over 50 now or just about.  And I'm not disinclined
> to do something for her but the history that I've got in this and the
> two mental status exams that I've got here completely – and then the
> history.  The only history I've got is two admissions where she's
> considerably high on alcohol and one was where she's dead

drunk. . . .  And so the problem is I don't have any evidence to support any kind of disability. I mean, the longitudinal record doesn't give me any evidence at all.  *Now, I'm not saying that the doctor might not have some evidence.  It's just that based on what I see in his notes I don't see anything that unusual in his notes.  Now, I can't make them all out.  She might have said some stuff that's very unusual and he might have actually done a mental status exam and he said the kind of things that – but I didn't see it in there*. . . .

Here's the problem. When somebody comes in – and this is how I evaluate these type of things.  When somebody comes in and they talk about things that are happening to them and they talk in a logical realistic way and it's not tangential and it's not something that seems out of line and the guy just puts it down and there's nothing – and he says well, maybe I should do this *and I don't know what exactly it said.  I can't tell you know, what he said*.  Then it doesn't look like it's that usual a note in other words.  Well, if they come in they're saying well, somebody said that they're jumping off the roof and I saw a giant alligator chasing me around yesterday then, you know, then you worry about – then that's got something that's in the notes that supports psychosis or something like that. *Now, I don't know what supports what he's saying, because I can't tell you*.  He didn't even see her until the end of '07 and she had already been off of work for a year.  And how he would make any kind of evaluation as to whether she could work or not when she apparently hasn't tried to do any work is – *now, if she appeared the way she appeared today that could be.  The problem is that she – it doesn't look like that's how she appeared from the notes*. . . .  It looks like all they're talking about is just the regular things that people talk about when they come in.  [For example, "I'm having trouble with my daughter"]. . . .  *I just don't know how to evaluate the case* and I don't have any evidence, longitudinal evidence in this file to support her presentation today.

(Tr. 92-95 (emphases added).)  Thus, the ALJ assumed that the illegible portions of Dr. Greene's notes – which are the majority of his notes – do not support his opinions.  But it is unclear why this is a valid assumption; the Court does not take lightly the notion that a long-time treating source's notes presumptively do not support a subsequent functional assessment.

And the Social Security Administration, at least to some extent, agrees.  S.S.R. 96-5p

provides, in relevant part:

> Under 20 CFR 404.1527(e) and 416.927(e), some issues are not
> medical issues regarding the nature and severity of an individual's
> impairment(s) but are administrative findings that are dispositive of
> a case; i.e., that would direct the determination or decision of
> disability. The following are examples of such issues:
>
> 1. Whether an individual's impairment(s) meets or is equivalent in
> severity to the requirements of any impairment(s) in the listings;
> 2. What an individual's RFC is;
> 3. Whether an individual's RFC prevents him or her from doing past
> relevant work;
> 4. How the vocational factors of age, education, and work experience
> apply; and
> 5. Whether an individual is "disabled" under the Act.
> The regulations provide that the final responsibility for deciding
> issues such as these is reserved to the Commissioner.
>
> Nevertheless, our rules provide that adjudicators must always
> carefully consider medical source opinions about *any issue, including
> opinions about issues that are reserved to the Commissioner. For
> treating sources, the rules also require that we make every
> reasonable effort to recontact such sources for clarification when
> they provide opinions on issues reserved to the Commissioner and the
> bases for such opinions are not clear to us.*

S.S.R. 96-5p, 1996 WL 374183, at *2 (emphasis added).  Given that the ALJ – even in view of the

November 2009 Letter – maintained that "Dr. Greene's treatment records would potentially provide

the strongest support for the claimant's allegedly disabling functional limitations, but their content

remains a mystery," the ALJ had a duty to recontact Dr. Greene about his treatment notes at least to

the extent that they pertained to his August 2008 Opinion that Plaintiff could not work (an issue

reserved to the Commissioner).  But nothing suggests that the ALJ made "every reasonable effort" to recontact Dr. Greene.[7]

And to the extent that Dr. Greene's November 2009 Letter provided the bases for his earlier opinions – such that S.S.R. 96-5p was inapplicable – the ALJ merely recounted the contents of this letter in his narrative and made no effort to explain why Dr. Greene's explanation for finding Plaintiff's depression and bipolar severe (i.e., that she was refractory to medication) did not substantiate his earlier opinions.  As such, the ALJ has deprived the Court of his reasoning for finding Dr. Greene's opinions unsupported.

Turning to the second-half of the controlling weight test – whether Dr. Greene's opinion is inconsistent with other substantial evidence in the case record – the Court finds that the purportedly inconsistent evidence relied upon by the ALJ falls short of substantial evidence when weighed against Dr. Greene's treating-source opinions.  *Hensley v. Astrue*, 573 F.3d 263 (6th Cir. 2009) provides guidance in this regard.

In *Hensley*, the Sixth Circuit reasoned that simply because a single agency physician provides an opinion contrary to that of a treating source, this fact does not constitute a good reason for giving the treating source opinion less than controlling weight.  The treating source in *Hensley* had seen the

---

[7]The Commissioner cites *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269 (6th Cir. 2010) for the proposition that an ALJ's rejection of treating physician's opinion may be upheld even where the treating source's handwriting was only partially legible.  (Def.'s Mot. Summ. J. at 14.)  Although that case dealt with poor handwriting and involved S.S.R. 96-5p, the Court finds it distinguishable from this case.  In particular, in *Ferguson*, the Sixth Circuit held that the bases for the treating source's opinions were known to the ALJ, and, accordingly, S.S.R. 96-5p was inapplicable.  *Id.* at 274 ("[T]he bases for [the treating source's] opinion cannot be said to be unclear.  [Plaintiff's] reported history and subjective complaints were the bases for [the] opinion. These bases were not unclear. . . .  In this respect, [the treating source's] opinion was deemed unpersuasive not because its bases were unclear, but because they were not corroborated by objective medical evidence.").

claimant "numerous times" over a three year period for elbow, arm, hand, and spine problems whereas the SSA physician had only "conducted a single consultative physical examination" of the claimant. *Id.* at 265. Both physicians had completed RFC assessments: the treating source found that the claimant's physical impairments prevented pushing or pulling; the SSA physician reached the opposite conclusion. The ALJ took the opinion of neither physician, however, instead reasoning that the claimant could "occasionally" push or pull. *Id.* at 266. The ALJ's reasoning for rejecting the treating source's more restrictive limitation "was that another physician had reached the opposite conclusion." *Id.* at 266.

The Sixth Circuit held that this "was not an adequate basis for rejecting [the treating source's] opinion." *Hensley*, 573 F.3d at 266. The Court of Appeals reasoned,

> Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion.
>
> Indeed, the administrative judge's reason for declining to give [the treating source's] opinion controlling weight would seriously undermine the Commissioner's position that controlling weight ordinarily should be given to the opinion of the treating physician. In most cases such as this, there will be conflicting medical opinions. If the existence of such a conflict is enough to justify denying the treating physician's report controlling weight, it would be a rare case indeed in which such weight would be accorded.

*Id.* at 267.

At first blush, this case might appear distinguishable from *Hensley* as arguably three doctors, as opposed to one, evaluated Plaintiff (or her records) and provided opinions contrary to Dr. Greene's. However, a closer inspection reveals that the ALJ's analysis does not present a significant departure from that rejected by the Sixth Circuit. First, although the ALJ used Dr. Kwon's

-24-

December 2006 evaluation to discount Dr. Greene's opinions, the two physicians' findings are not diametrically opposed because Dr. Kwon made no functional assessment of Plaintiff.   Therefore, while Dr. Kwon's diagnoses may have been less severe than Dr. Greene's, nothing Dr. Kwon indicated was directly contradictory to the functional limitations that appear in Dr. Greene's October 2009 Opinion.   The closest Dr. Kwon came to making functional findings was his opinion that Plaintiff had "moderate" depression, and his indication that Plaintiff's *symptoms* from her depressed mood and panic attacks were only "problematic" as opposed to "significantly problematic."  (Tr. 226.)   But these findings should be viewed in conjunction with Dr. Kwon's bipolar disorder diagnosis and contemporaneous GAF score signifying "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *See DSM-IV* at 34.   The ALJ instead focused only on the parts of Dr. Kwon's report indicating that Plaintiff had a normal rate of speech, denied hallucinations and delusions, and was alert and well-oriented.  (Tr. 17 (citing Tr. 230).)   And the ALJ's discounting of Dr. Kwon's GAF score is somewhat perplexing.   He found that the assessment was not fully supported by Dr. Kwon's clinical observations and only represented a "snapshot" of Plaintiff's functioning.  (Tr. 17.)  But it is unclear why Dr. Kwon's GAF score should be given less weight than his other findings, for example, that Plaintiff was alert and well oriented – both were only a "snapshot" of Plaintiff's functioning.

Turning to the two DDS evaluators, Drs. Zarski and Kriauciunas, they essentially functioned as a single evaluator.   Dr. Zarski examined Plaintiff but made no functional assessment.   And Dr. Kriauciunas provided a functional assessment but did not examine Plaintiff.    Instead, Dr. Kriauciunas relied on the medical evidence of record through 2007.  But, at the time of his file

-25-

review, Plaintiff's file at most included Drs. Kwon and Zarski's evaluations and the records from Plaintiff's hospitalizations. Dr. Kriauciunas' evaluation did not include the majority of the treating physician's notes. The combined effect of Drs. Zarski and Kriauciunas assessment was therefore akin to having a single DDS evaluator review medical records from Dr. Kwon and Plaintiff's hospitalizations, examine Plaintiff twice, and then complete a functional capacity assessment.

Thus, the medical evidence "inconsistent" with Dr. Greene's opinions – opinions by a psychiatrist who had treated Plaintiff 22 times – can be summarized as follows. One physician diagnosed Plaintiff as bipolar and found her depression "moderate" but did not offer a functional assessment and assigned a GAF score indicating severe limitations, and two DDS physicians, whose combined effort involved reviewing a limited file and examining Plaintiff twice, found that Plaintiff's mental capacity to be "mild" to "moderately" limited. So viewed, the evidence contrary to Dr. Greene's opinions is not significantly greater than that in *Hensley* where an agency physician examined the plaintiff and offered a functional assessment. Yet, in that case, the Sixth Circuit found it was error for the ALJ to give the treating source opinion less than controlling weight solely on the basis of the agency physician's contrary assessment.

But this Court may assume, under the deferential standard accorded an ALJ's decision, that the ALJ reasonably gave less than controlling weight to Dr. Greene's RFC Assessment. It nonetheless remains that Dr. Greene's opinion was entitled to "great deference" unless the ALJ provided "good reasons" for discounting it. *Hensley*, 573 F.3d at 266 ("Even if the treating physician's opinion is not given controlling weight, 'there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference.'" (quoting *Rogers*, 486 F.3d at 242)); *see also* S.S.R. 96-2p, 1996 WL 374188, at *4 ("Adjudicators must remember that a

-26-

finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.").

This explanatory requirement associated with discounting a treating-source opinion is for the benefit of the claimant and the Court, and the failure to give "good reasons" readily triggers a remand under Sixth Circuit precedent. *Sawdy v. Comm'r of Soc. Sec.*, 2011 WL 3805638, at *2 (6th Cir. Aug. 29, 2011) (noting that the course of action for failure to comply with the "good reasons" requirement is now "well charted" in the Sixth Circuit: "when an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'"); *Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.").

Here, the ALJ did not give Dr. Greene's RFC Assessment "great deference"; instead the ALJ assigned Dr. Greene's opinions "limited weight." (Tr. 18.)  And a full reading of the narrative along with the hearing testimony suggests that the ALJ rejected Dr. Greene's opinions.  (*See* Tr. 18 (noting that without a longitudinal record to substantiate Dr. Greene's opinions "the undersigned is left to rely on the other available evidence"); Tr. 79 ("You [may] want to get [Dr. Greene] to type . . . his records up.  Maybe he can look through his records and say what he's saying all this time. . . .  I

-27-

don't see anything credible about this.").)  The Court finds, however, that the ALJ did not provide the requisite "good reasons" for doing so.

As an initial matter, the ALJ essentially found that the first, second, and fifth weighting factors – factors involving the length, nature, and extent of the treatment relationship and the medical specialty of the treating source – favored giving Dr. Greene's opinion substantial weight.  (*See* Tr. 18.)  But the ALJ then conclusorily addressed the remaining factors: "[Dr. Greene's] opinion is not well-supported or well-explained, and is not fully consistent with the record as a whole."  (Tr. 18.)  The Sixth Circuit has held that conclusory remarks are insufficient to satisfy the explanatory aspect of the treating physician rule.  *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (holding that while a "lack of compatibility with other record evidence is germane to the weight [accorded] a treating physician's opinion, an ALJ cannot simply invoke the criteria set forth in the regulations if doing so would not be 'sufficiently specific' to meet the goals of the 'good reason' rule.").

And if this Court were to extrapolate from this statement that the ALJ was referencing the contrary opinions of record, this would not be a "good reason" for giving Dr. Greene's opinions essentially no weight.  In November 2009, Dr. Greene reasoned that based on his treatment of Plaintiff – which by that time involved over 20 visits during a two-year period – Plaintiff's depression remained severe despite the prescription of a host of antidepressants and anti-anxiety medications.  On the other hand, while Plaintiff was prescribed similar medications at the time of Dr. Zarski's mental status exams (Tr. 82), none of Drs. Kwon, Zarski, or Kriauciunas based their opinions on Plaintiff's long-term responsiveness to medication, and none of those doctors could have concluded that by November 2009 – almost two years after Dr. Kriauciunas's January 2008

-28-

evaluation – that Plaintiff would still remain severely depressed and bipolar.  Moreover, the ALJ suggested at the hearing that Plaintiff's condition had worsened since the last of Drs. Kwon, Zarski, Kriauciunas' evaluations. (Tr. 82 ("[L]ook at those two mental status reports. . . . [T]his is a sharp lady. . . .  This isn't want we see today. What happened? What's the dif? You know, how am I supposed to give any credit to this psychologist [Dr. Greene]?"); Tr. 84 ("I mean, this is like – this is completely a different person entirely than the person who appeared here who can't answer questions well.").)  The ALJ's observations comport with Dr. Greene's conclusion that medication had been ineffective and therefore Plaintiff needed electroconvulsive therapy to treat her severe mental impairments.  Accordingly, there is nothing necessarily inconsistent with Dr. Greene's opinion that Plaintiff's mental impairments were severe because of her continued unresponsiveness to medication and the earlier opinions of doctors that could not consider the long-term effectiveness of Plaintiff's medications or Plaintiff's evolving condition over time.

As to the ALJ's comment that Dr. Greene's opinion was not "well-supported or well-explained," in addition to this Court's earlier critique of this reasoning, the Court finds that Dr. Kriauciunas' opinion was at least as conclusory as Dr. Greene's.   Dr. Kriauciunas' Mental RFC Assessment and PRTF contain no explanation of what evidence he reviewed and how he reached his conclusions.  (*See* Tr. 257-75.)  Yet the ALJ gave Dr. Kriauciunas' opinion "substantial weight." (Tr. 16.)  As Plaintiff has argued to this Court, it is inconsistent on the one hand to discount a treating source's opinion as not "well-explained" yet fully credit a conclusory opinion from a non-examining, one-time evaluator (who reviewed a limited record).  *See* 20 C.F.R. § 404.1527(d)(3) ("[B]ecause nonexamining sources have no examining or treating relationship with [the claimant],

the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.").

In short, the ALJ appears to have found that three weighting factors favored giving Dr. Greene's October 2009 Opinion great deference. Yet the ALJ gave that opinion close to no weight. This was because, according to the ALJ, Dr. Greene's opinion was not well-supported and inconsistent with other record evidence. But as to the latter claim, the ALJ assumed that Dr. Greene's illegible treatment notes did not support his opinions, and, moreover, provided no explanation as to why Dr. Greene's November 2009 Letter did not reflect a summary of those notes or otherwise provide the desired longitudinal support. And as to the former claim, this Court has explained that the summation of the other opinions of record – when compared against Dr. Greene's longitudinal assessment of Plaintiff – treads closely to the treating-source analysis proscribed in *Hensley*, and, more importantly, Dr. Greene's October 2009 Opinion and supporting letter were not necessarily inconsistent with opinions that were completed close to two years prior and did not consider the long-term effect of Plaintiff's medication. Accordingly, this Court cannot say that the ALJ provided the requisite "good reasons" for giving Dr. Greene's opinion essentially no weight.

And the other evidence the ALJ suggested was contrary to Dr. Greene's opinion does not alter this conclusion. First, the ALJ noted that Plaintiff had "relatively unrestricted activities of daily living." (Tr. 18.) Apparently, the ALJ relied on Plaintiff's function report – completed almost two years prior to the hearing – to conclude that Plaintiff performed personal care, prepared simple meals, cleaned her home, shopped, and socialized with relatives. (Tr. 19.)

But the ALJ failed to note that the same function report indicated that Plaintiff would only leave her home if she had to (Tr. 179), that she spent periods of the day staring out the window (Tr.

-30-

173), that she had only four to five interrupted hours of sleep per night (Tr. 174), light cleaning tasks took Plaintiff a day or more to complete (e.g., dishes took two days) (Tr. 175), Plaintiff had no hobbies, interests, or social activities (Tr. 177-78), and Plaintiff only regularly left her home for doctor's appointments (Tr. 177). Moreover, Plaintiff's testimony at the hearing was that

> [I usually don't get dressed]. And I just sit at the table or sometimes I turn the TV on. Well, the TV's always on. . . . But I might just look out the window or – I don't usually leave my house. Or I get the paper and I might try and read some of that, but I don't usually read the whole paper. And then you know, I just – I don't usually go anywhere because I don't like to go outside.

(Tr. 48.) And Plaintiff's sister testified similarly:

> [O]ne of her exercises would be to clean the tub. She won't complete cleaning the tub and you have[] to keep on her about it. . . . She stays at home all the time. . . . She also can't watch a full sitcom. She just nillies around the house. Half the time you go over there she's not dressed.

(Tr. 64-65.) Accordingly, the ALJ's implicit reliance on Plaintiff's daily activities to reject Dr. Greene's opinion was not supported by substantial evidence.

The ALJ also noted that Plaintiff "briefly worked as a housecleaner after the onset date." (Tr. 18-19.) But the testimony at the hearing was that this was extremely limited work that ended with Plaintiff being fired. (Tr. 58.) In fact, Plaintiff cleaned one home only three times before being fired. (*Id.*) Plaintiff also reported to Dr. Kwon in early 2007 that she had been repeatedly fired. (Tr. 235 ("She can't hold job, was fired again.").) Plaintiff's sister testified that Plaintiff did not work from 2007 onwards (Plaintiff's alleged onset date was November 2006) and that she knew this because she (or her niece) would be responsible for driving Plaintiff to any job (due to Plaintiff's

-31-

driving anxiety).  (Tr. 64.)  Accordingly, Plaintiff's "work" with her impairments was also a slender

reed for rejecting Dr. Greene's opinion.

In short, this Court finds that the ALJ did not provide "good reasons" for giving Dr. Greene's

opinions "limited weight."  Additionally, the Court does not find this to be one of the "limited

situations" in which the ALJ's procedural error may be overlooked as harmless.  *See Wilson*, 378

F.3d at 547.  Accordingly, remand is required.  The Court will briefly address Plaintiff's remaining

points of error.

### 2.  *The ALJ Fully And Fairly Developed the Administrative Record*

Plaintiff asserts that the ALJ conducted the October 2009 hearing "in a <u>totally</u> inappropriate

manner."  (Tr. 3.)  More specifically, Plaintiff asserts that the ALJ (1) asked lengthy questions with

Plaintiff responding only briefly before the ALJ asked another drawn-out question,   (2)

inappropriately gave Plaintiff "medical advice and counseling," and (3) inappropriately questioned

whether Plaintiff would even want to receive social security benefits.  (Pl.'s Mot. Summ. J. at 3-4.)

Plaintiff, however, does not assert that the ALJ's decision was biased but, rather, that the ALJ

conducted an improper hearing and failed to develop a full and fair record.  (Pl.'s Resp. to Def.'s

Mot. Summ. J. at 2-3.)

The Commissioner notes that "the ALJ's best interests would be served in the future by

refraining from discussing his experiences and concerns."  (Def.'s Mot. Summ. J. at 9.)  This Court

agrees; the Court fails to see the need for the ALJ to discuss, for example, his experience

representing alcoholics and the anger that alcoholics generally experience.  (Tr. 43.)  The Court also

finds it imprudent for the ALJ to inform Plaintiff that "if I give you disability you know, that might

be the way you're going to be the rest of your life because you'll never go out of the house again." (Tr. 102.)

Yet, as the Commissioner has argued, it does not appear that the ALJ was biased in his decision. (Def.'s Mot. Summ. J. at 9-10.) Upon careful review of the hearing transcript and the narrative accompanying the ALJ's decision, the extraneous comments by the ALJ during the hearing do not appear to have factored into his determinations so as to suggest bias. "[Federal courts] presume that judicial and quasijudicial officers, including ALJs, carry out their duties fairly and impartially. . . . [Plaintiff] has the burden of persuading [the Court] otherwise, which she can do only with 'convincing evidence that a risk of actual bias or prejudgment is present.'" *See Bailey v. Comm'r of Soc. Sec.*, 413 F. App'x 853, 856 (6th Cir. 2011) (quoting *Navistar Int'l Transp. Corp. v. U.S.E.P.A.*, 941 F.2d 1339, 1360 (6th Cir. 1991)). Plaintiff has not met this standard of proof; in fact, as indicated above, Plaintiff has clarified that she is not even asserting a claim of bias. (Pl.'s Resp. to Def.'s Mot. Summ. J. at 2.)

As to Plaintiff's assertion that the ALJ failed to fully and fairly develop the record, this Court disagrees. "Only under special circumstances, i.e., when a claimant is without counsel, is not capable of presenting an effective case, and is unfamiliar with hearing procedures, does an ALJ have a special, heightened duty to develop the record." *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003). Further, "[t]he ALJ's duty to develop a full and fair record does not extend so far as to require the ALJ to act as the claimant's advocate." *Ison v. Astrue*, No. 5:10cv286, 2011 WL 4565775, at *8 (E.D. Ky. Sept. 29, 2011). In this case, Plaintiff was represented by counsel at the hearing and thus the ALJ had no heightened duty to develop the record. *See Ison*, 2011 WL 4565775, at *8. And the wisdom of this rule was evident at the hearing: Plaintiff's counsel was

-33-

given an opportunity to question Plaintiff, her sister, and the VE – and did so.  (*E.g.*, Tr. 48-53, 61-68, 70-75, 88.)  Second, at the start of the hearing, the ALJ informed Plaintiff that she was to speak freely: "In this case you're never out of turn.  You got something to say go ahead and say it because all I'm trying to do is get information." (Tr. 29.)  The ALJ gave a similar instruction to Plaintiff's sister. (Tr. 30.)  Third, the ALJ was well prepared for the hearing as evidenced by his discussion with Plaintiff and her counsel about the medical evidence of record.  (*E.g.*, Tr. 45-46, 78, 82.)  Fourth and finally, the Court notes that the ALJ allowed Plaintiff to supplement the record post-hearing; in particular, the ALJ made clear at the hearing that he believed that Dr. Greene's treatment notes did not support his opinions and suggested that Plaintiff obtain clarification from Dr. Greene afer the hearing. (Tr. 92.)  In short, this Court disagrees with Plaintiff that her hearing "failed to meet even minimal standards of what a fair hearing should be" (Pl.'s Resp. to Def.'s Mot. Summ. J. at 3), and finds that the ALJ fairly and fully developed the record in this case.

### 3.  *The ALJ Did Not Ignore Testimony from Plaintiff's Sister*

Plaintiff argues that the ALJ failed to discuss Plaintiff's sister's testimony in his decision: "The ALJ spends a great deal of time eliciting testimony from witness Rager, as does claimant's attorney, but he makes no mention of her testimony in his decision."  (Pl.'s Resp. to Def.'s Mot. Summ. J. at 3; *see also* Pl.'s Mot. Summ. J. at 17.)  This is an incorrect statement of fact.  The ALJ referenced Plaintiff's sister's testimony twice in his decision evidencing that he clearly considered her testimony in making his disability determination. (Tr. 14, 16.)

To the extent that Plaintiff asserts that the ALJ did not make a credibility judgment as to Plaintiff's sister, the Court agrees with Plaintiff only to the extent that the ALJ did not explicitly do so.  It is apparent from the ALJ's narrative that he implicitly discounted her testimony for the same

reasons he discounted Plaintiff's testimony.  In fact, it appears that the ALJ viewed Plaintiff's sister's testimony as corroboration for Plaintiff's testimony and therefore made a single credibility determination:

> [Plaintiff] alleges frequent anxiety attacks around groups of people. She reports fear of driving and generally does not leave her home. *The claimant's sister testified that the claimant has difficulty concentrating and completing tasks, and often needs reminders to finish tasks.  She reported that the claimant watches television, but does not watch entire programs due to impaired concentration*. The claimant reported that she her recent attempts to work eventually failed because she was not performing up to her employer's specifications. . . . After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [determined] residual functional capacity assessment.

(Tr. 16 (emphasis added).)  Accordingly, the Court does not find that the ALJ's failure to make an explicit credibility determination as to Plaintiff's sister to be reversible error.  *See Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir. 1988) (finding that Appeals Council's failure "to spell out in its opinion the weight it attached to [Plaintiff] and her husband's testimony" was not reversible error where Council provided a "lengthy discussion of the medical evidence" and made "clear that it did not credit any testimony at variance with the objective record"); *Rutherford v. Astrue*, No. 3:10–cv–00376, 2011 WL 4014431, at *10 (M.D. Tenn. Sept. 9, 2011) *report adopted by slip order* (M.D. Tenn. Sept. 30, 2011) (finding that the ALJ's "failure to discuss the statements from Plaintiff's mother [did] not constitute reversible error" where "the ALJ based his determination on opinions . . . whose findings contradict[ed] the mother's statements").

-35-

1:10-cv-13719-TLL-MAR   Doc # 19   Filed 10/31/11   Pg 36 of 38   Pg ID 548

### 4. Dr. Kwon was not a Treating Physician

Plaintiff asserts that Dr. Kwon was a treating source and implies that the ALJ erred in not giving treating-source deference to Dr. Kwon's opinions. (Pl.'s Mot. Summ. J. at 11, 13.)  The Court finds no error in this regard.

"A physician qualifies as a treating source if the claimant sees him 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.'"  *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1502).  In *Smith*, the Sixth Circuit found that a doctor who "completed a medical report, prescribed and refilled back pain medication, and denied additional medication when [the Plaintiff] returned seeking more" was not a treating physician. 482 F.3d at 876; *see also Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 n.3 (6th Cir. 2011) (noting that "it is questionable whether a physician who examines a patient only three times over a four-month period is a treating source – as opposed to a nontreating (but examining) source.").

Here, the record reflects that Dr. Kwon examined and diagnosed Plaintiff in December 2006 and that he reviewed Plaintiff's medication in January 2007.  (Tr. 224, 235.)  Two visits during a two-month period does not evidence the type of longitudinal relationship that warrants treating-source deference.  *See Smith*, 482 F.3d at 876; *Helm*, 405 F. App'x at 1001 n.3.  Accordingly, the ALJ correctly analyzed Dr. Kwon's opinions without applying the treating-source rule.

### G.  Conclusion

For the foregoing reasons, this Court finds that the ALJ did not provide the requisite "good reasons" for assigning Plaintiff's treating physician's opinion "limited weight."   Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART,

-36-

that Defendant's Motion for Summary Judgment be GRANTED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner be REMANDED.

On remand, the ALJ should determine whether the bases for Dr. Greene's opinions remain unclear in view of the November 2009 Letter.  If so, the ALJ should attempt to recontact Dr. Greene pursuant to S.S.R. 96-5p.  If not, the ALJ should explain why the November 2009 Letter does not provide the desired longitudinal support for Dr. Greene's opinions.  The ALJ should also balance the factors for weighing Dr. Greene's opinions in view of this Court's analysis of the opinions of Drs. Kwon, Zarski, and Kriauciunas.

## III.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be no more than 20 pages in length unless,

by motion and order, the page limit is extended by the court.  The response shall address  each issue

contained within the objections specifically and in the same order raised.

s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated:  October 31, 2011


*Certificate of Service*

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date,*
*October 31, 2011, by electronic and/or first class U.S. mail.*

*s/Melody R. Miles*
*Case Manager to Magistrate Judge Mark A. Randon*
*(313) 234-5542*
